We have one case this afternoon and it is in Re Philadelphia Newspapers,LLC, number 11-3257, Mr. Barnes and Mr. Galati. May it please the court, Alex Barnes, law firm of my Redmond Maxwell & Hipple, representing the appellants Vaughn Greggian, Danielle Greggian, Charter School Management and I request the reservation of three minutes for rebuttal. That's fine. Just at the outset, some factual questions. Why didn't you seek a stay of the plan once it was confirmed at the end of September? Well, the plan was actually confirmed in June of 2010 in the form of the fourth amended plan of reorganization. What was the hearing at the end of September then? I think that was to confirm the terms of the sale and tidied up some of the loose ends regarding the sale of the assets to Philadelphia News. But you didn't seek a stay of the plan once it was confirmed? Under the fourth amended plan, that was in June. That was several months prior to the hearing regarding the administrative claim in August. Okay. Let's go to the end. Let's assume for the moment this is not equitably moved. Let's assume we get to the merits of your claim. The Kinney article, which came out in 2010, with a hyperlink to an article from December of 2008, how is that a republication under the Pennsylvania's or Commonwealth law? Okay. Well, the contents of the Kinney article are somewhat unique in that in a very unrestrained fashion, the author of that article subscribes a host of wrongdoing to charter schools. And she said my colleague, in effect, did a good job, and here's a hyperlink to what she did. Right. She endorsed the writing of Martha Woodall. She called Martha Woodall's writing remarkable. And then, and this is important, she directs the readers of the Kinney article to go use the hyperlink and go to the charter page where they will find stories of greedy grownups pilfering public gold under the guise of enriching children's lives. So what Kinney is doing in the article is really reclassifying and adding to and enhancing the defamatory material and the defamatory comments that were set forth in the charter page. What did it add, other than to say my colleague did a nice job? Well, in the context of the – What else did it add to? You know, here's our problem. There's a one-year statute of limitations. Correct. If we buy into that every time that there is a hyperlink to an article that you think may have defamed your clients, then you are going to eviscerate the statute of limitations. This case is a little bit different than the three cases that were cited by the district court, which found that a mere hyperlink is not sufficient to constitute a republication because, in essence, that hyperlink is more akin to another copy of a book rather than a new edition. Here, the Kinney article speaks a lot about charter schools and talks about all the wrongdoing. But it's an opinion piece that doesn't even mention you or your clients. I'm sorry, I didn't hear that. It's an opinion piece that doesn't even mention your clients. But you have to look at the three pieces together. You have to look at the Kinney article with its direction to go to see the remarkable reporting where you're going to see the pilfering of public gold to enrich the children's lives. Can we go back to Judge Ambrose's question about eviscerating the statute of limitations? Why isn't that so? I mean, this is going to stay on the Internet God knows for how long. So any time that anyone is directed there, we'll create a new preservation. Why isn't that true? Because the Kinney article adds additional information, which informs the reader, who then is subsequently looking at the charter page or looking at the underlying articles. It adds additional information. Does it add additional defamatory information? It's our opinion that it is. Can you cite for us what verbiage in there constitutes the defamation? Because what Monica Ann Kinney is saying is that all of the – I'm asking you to cite it instead of paraphrasing it. Can you cite for us what Kinney said that is defamatory? Greedy grown-ups pilfering public gold. She is saying that all the people, all the articles that appear on the charter page, all have something to do with greedy grown-ups pilfering public gold at the expense of children's lives. But now we come back to Judge Fuente's point. Isn't that just an opinion piece? I believe that she's acting. When you look at the context of the Kinney article and the context of the charter page and the underlying articles, that they all combine together to create one comprehensive statement. Is it the case that any time somebody writes an article about charter schools and says charter schools are stealing money and they're not educating our children, by the way, see this link, and it links back to that article, that person is defaming you. Is that the case? It depends if they are merely making a content-neutral reference or if they're adding additional content, which in and of itself can be defamatory. Your theory is very novel. All you have to do is go to a hyperlink, the link takes you to another article, and that itself creates a tort. I don't know any current case that supports that theory. The only thing I could find was there was a really good case analysis by Judge Haburn in the Western District of Kentucky, the Sawyer case, which is at 701 F sub 2nd, 912. And it seems like the critical feature is, did the second article change the contents of the initial article that was perceived to be defamatory? And I don't see how it changed the contents. Maybe you could argue it went to a new audience, but did it really change the contents? The Sawyer case is a little bit different from the facts here. In Sawyer, there was a subsequent article that merely had a reference to the A Few Good Men article, which was the subject of the defamation, and didn't itself, the subsequent article, didn't have any additional exacerbating content, which then relates to and enhances the original defamatory communications that are the subject of the litigation. It's very different from what is happening here, because the Monica Kinney article contains independent acts of defamation against our client by basically accusing the appellants of pilfering public gold  So if someone were to write an article about financial advisors, and it was a piece that said money managers pilfer public gold, and then they had a link to the convictions or the rap sheets, better yet, the link was then to articles that talked about Madoff and Milken, etc. That's defamation? That's a new defamatory act? If it's adding to the content of the previously posted material, yes. In your particular instance, it sounds a little bit more like a content-neutral reference or a content-neutral link. You're still throwing mud on the Madoffs and the Milkens of the world. That's what the author is doing, but it's not making any particular reference to them other than including the links to the articles about them. I guess what I'm asking is what's the new material here? Really, it's a republication. We contend that the Kinney article is a republication. Pennsylvania law says it's a one-byte rule. It's a single-publication rule, isn't it? But there's an exception to the single-publication rule in the form of a republication. When there is a new form or new material, new defamatory material that is subsequently published, that relates back to the originally published material. Wouldn't you need to add something new that says something like, an investigative reporter might have written some follow-up article that says, following up on our piece three years ago about the wasteful spending of charter schools, we now present new information about your clients, et cetera, et cetera, et cetera. Then you've got a new clock that starts ticking because they've provided new information about your clients. But here, what's the new information other than providing a link to something that was previously published? Well, taking a look at the specific allegations of the Kinney article, where the Kinney article is stating that Pennsylvania charter schools are charging granite countertops to taxpayers, taking trips to Disney, employing their children at $100,000 a year to read Dr. Seuss, employing family members and then funneling lease payments through related profit and non-profit businesses, taking a look at those accusations in the context of the demand for the reader to then go to the charter page where they see the two articles regarding the appellants, front and foremost, separately highlighted in big, bold print with pictures, that is done in a way to encapsulate and create the inference. It draws attention. It certainly does draw attention, and it creates a false impression that the two articles regarding the appellants that appear on the charter page have something to do with all of the accusations that are set forth in the Kinney article. You really have to look at it as to what would a reasonable reader conclude after reading both the Kinney page, the Kinney article, the charter page, and the two underlying articles. And that reasonable reader would attribute the outlandish statements that are set forth in the Kinney article. They would wrongfully attribute those statements to our clients. Mr. Barnes, can I ask you a question? I recognize an important issue, but the district court said that your claim just doesn't qualify as an administrative expense under 503, 503B, because it's unliquidated, it's contingent, and it just doesn't fit. So I look at 503, and I'm trying to find where in 503, and there was a laundry list of examples of administrative expenses, and I couldn't find how this claim for defamation benefits the estate, benefits the estate, fits within any of these examples. Maybe you can point me. Okay. The statutory prongs of Section 503 are clear, that for an allowable administrative expense, there must be an expense that arises that's actually necessary to preserve the estate, and that arises from a post-petition transaction between the debtor and the third party. Did you say benefits or? Well, but there has been case law that says that it doesn't have to be a benefit. A post-petition tort has been recognized both in this jurisdiction, in the In re Cohen and Sons Catering case, as well as the Supreme Court in the Redding case. Is it tort like a defamation action? A post-petition tort that arises in the continuation of the debtor's reorganization is considered to be a cost of doing business. The Supreme Court has said in Redding, yeah, you could have a tort that could be a 503B claim, but it has to be actual and necessary expenses that are related to the preservation of the estate and that arose from a situation conferring a benefit upon the debtor. How does this confer benefit on the debtor? Because the revenue that the debtor derives to keep his reorganization going is from selling newspapers, and the debtor sells newspapers by creating scandalous, sensational stories. See, I wouldn't look at it that way. I'd look at it, your tort and recovery for your tort would benefit the debtor. How would that be? It doesn't necessarily, the recovery of the tort doesn't necessarily have to benefit the debtor. The actions that created or the actions that resulted in the tort have to be done in the continuation of the debtor's business, and that continuation itself is to the debtor's benefit, but the debtor also, out of fundamental fairness, needs to be responsible and needs to compensate those who are injured by the debtor's activities during its reorganization. Thank you. We'll hear from Mr. Gulati and get you back on rebuttal. Good afternoon, Your Honors. Anish Gulati, counsel for the APOLE, Philadelphia Media Network, Inc. Let me ask you, just at the outset, on the equitable mootness thing, which is, as you know from a 1996 decision, Continental was highly debated on our court. It was a 7-6 decision that I think was written by Judge Sloviter and a really strong dissent by now Justice Alito. There's five factors. Yes. And it's whether the plan's been substantially consummated, whether the stay has been obtained, whether it would affect the rights of parties not before the court, public policy, and whether it would affect the success of the plan. Yes. But when you strip them all away, first of all, just as a factual matter, I see that the judge dealt with the first two. I don't see where he dealt with the three, four, and five factors. Yeah, you're correct. He didn't explicitly address the remaining factors in his written opinion. He did cite this court's decision in Continental, which sets forth the relevant standard. All of the factors were briefed by the APOLE in briefing before the district court, and there's no reason to believe that the court didn't consider and explicitly discuss them in its written opinion. The fact is that the parties did not argue that this appeal would affect the success of the plan or that it would impact the rights of parties not before the court. So there was no reason for the court to include and express. The whole purpose of equitable mootness, I mean, let's strip it all away and just talk plain English. It's does it wreak havoc on the plan to have an appeal go forward? Would it unravel the plan? It's hard for me to think that a $1.8 or $1.9 million claim out of the $55 million, which is, I guess, 3.3%, is going to wreak havoc or unravel this plan, even if it were to be a valid administrative claim. That's right. We didn't argue that this would unravel the plan. On appeal, the opponents have argued, citing this court's decision in Zenith, that an appeal cannot be equitably moot unless it would unravel the entire plan. That's not actually the law. More recent cases decided by this court, including the Semcrude case decided in January of this year, have found that an appeal could be equitably moot, even if it would not result in the unraveling of an entire plan where debtors and creditors relied on a bankruptcy court's decision in, for example, not setting aside a reserve for the payment of a claim where the debtor would not allow that claim to go forward. At some point, I think, if I were to guess, this issue is going to come back someday in bank. This is not necessarily the case. But then Judge, now Justice Alito's point was that courts have basically an unflagging obligation to decide cases and not to punt by saying that somehow it's going to equitably moot, whatever that means. I mean, in this case, let's go on to Judge Fuente's point about the 503B claim. There is an argument that you could have a tort claim in certain circumstances, the right kind of tort, that could be a 503B claim. And there's some dicta in one of our cases that indicates that that could be the case. But the facts here, you would say do not fit that? And if so, why? The facts don't fit a 503B analysis. Well, I mean, the statute is explicit. It requires that any allowed administrative expense claim be an actual unnecessary cost of preserving the estate. Damages arising out of pre-petition torts can sometimes meet that standard. Damages arising out of post-petition torts cannot. Here, the appellant simply failed to show that there was any actionable post-petition tort of defamation caused by any post-petition conduct by the debtors. Their administrative expense claim was based solely on pre-petition articles, which they allege were defamatory in a pre-petition state court litigation. I thought the Kinney article was post-petition. Yes, Your Honor, the Kinney article was post-petition. The bankruptcy court set an August 2nd bar date by which the appellants had to file their administrative claim request and set forth a legal and factual basis in support of it. The papers, and they did file their claim on August 2nd and file a legal brief in support of it. None of those papers mentioned the Kinney article. None of those papers mentioned this hyperlinking theory. These arguments came up for the first time in response to the debtor's opposition to the administrative expense claim. So the administrative expense request itself was not based on the Kinney article or any post-petition article. You're saying that was some sort of a waiver or procedural default? No, the bankruptcy court allowed them to develop this argument. Just disagreed with it. Yes. In the alternative. Yes. First said it was equitably moot. If it's not equitably moot, they don't have a cause of action under state law. Yes. Yes. It's not quite fair to say it was based entirely on pre-petition conduct. The request itself was based entirely on pre-petition. Initial request. Right, the initial request. But they litigated it by citing post-petition conduct. Yes. And it's undisputed that under the single publication rule as adopted in most states, including Pennsylvania, it is the initial publication of material that triggers a cause of action for defamation. Virtually every court to consider the issue has held that the single publication rule does apply to online content. So the fact that material continues to be available on the Internet. Isn't that hard to square, though, with the Internet era in which we live? I mean, what about the hypothetical where an article is published in 2006 and then some other things happen in 2009 and a 2010 article links to the 2006 article? I mean, as long as the 2010 article has some new information that you can't hide behind the fact that the initial story dates back six years, can you? Well, if an article is updated or modified, it would constitute a republication. Every court to consider the issue has held that a reference or hyperlink to pre-existing content on the Internet does not constitute a republication of that material. And here we don't even have to. That's the line of demarcation. It's going to be a question of whether there's new information in the subsequent article. Right. I mean, as held by Salyer v. Southern Poverty Law Center, the standard is that there has to be a modification of the substance of the pre-existing material. And here they argue that that happened because characterization was made by Kinney about the prior article. No. Here there was not even a hyperlink to any of the alleged defamatory articles. Well, that's the first thing you saw when you clicked on the hyperlink. No. The hyperlink linked to a general website about charter school issues. Yeah, but you saw the picture of, if I'm not mistaken, there were two pictures side by side. Yes. Right. That general website about charter school issues, which had not been modified after the petition date, did link to two of the articles that issued. The link takes you right there. There's no doubt about it. Yeah. That website also included over 40 other articles about charter school issues, which had nothing to do with the appellants. The reference in the Kinney article was to the reporting of Martha Woodall. Well, but it did have some fairly disparaging remarks about charter schools in general, and specific disparaging remarks about how they were making tons of money at the expense of the kids. Well, none of the other articles on the charter school webpage have been alleged to be defamatory against the appellants. The Kinney article itself does not include any reference to the defendants. It does include a reference to the reporting of Martha Woodall. Yes, most of the articles on the charter school website were authored by Ms. Woodall. Most of the articles about the appellants were not. Three of the four articles at issue in the state court action were authored by other people, not Ms. Woodall. There's no reason to believe that the reference to the general charter school page, which includes over 40 articles about charter school issues, was directing anybody to the specific articles about the appellants. And even if it did, every court considering the issue has held that directing somebody to preexisting content on the Internet does not material. In Churchill v. New Jersey, for example, there was a report about animal cruelty that was alleged to be defamatory. After the statute of limitations had run, there was a press release issued about that report, which directed people to view the report. It included a hyperlink to it. But Churchill said all he did was merely altered the way in which you could access the information. One could make an argument here, and your opponent does make it, that the comments made by Kinney were significant. I mean, they were disparaging of his clients. And they said, you know, hey, go look at my colleague's remarkable reporting about these folks. Well, first of all, they were not about his clients. They did not mention his clients. They did not include any reference to his clients. And there's no way. It was a generic reference to all the charter schools. Exactly, exactly. Well, but that puts them all in the soup, then, doesn't it? Well, I don't think the appellants are arguing that every charter school in the state of Pennsylvania has a cause of action for defamation arising out of the Kinney article and a link to that general website that includes numerous articles about charter schools. Let me shift gears for a second. You asked the court just prior to the scheduled August 31 hearing, at least initially scheduled August 31 hearing, to have an objection to the administrative claims of these folks and also another administrative claim for $10 million. Why did you single these out? There was also a priority claim, I guess a 507 claim, for $600,000 you didn't object to initially. I'm sorry. I don't have the answer to that question. And I realize that when you go through these things, if the bar date was August 2 and they filed by August 2, why wait until eight days before the initially scheduled hearing of August 31 to file an objection? Why not file it two weeks before that? Well, there was no scheduled hearing on the date that the debtors filed their objection. On the date that the debtors filed their objection, they asked for an expedited hearing on the merits of this claim to be held on August 26 because of the imminent closing under the purchase agreement. The bankruptcy court actually denied that request. It held the August 26 hearing solely on the motion to expedite and solely for the purpose of determining a workable schedule for a hearing on the merits. And at the August 26 hearing, which was held solely for the purpose of scheduling the hearing on the merits, the bankruptcy court asked both parties to propose a schedule. And after consultation with both sides, set the August 30th hearing date without any objection from the appellants. At no time during the August 26 hearing did the appellants suggest that they would not be prepared to move forward on August 30th on the merits. And at no time between the August 26 hearing and the August 30th hearing on the merits did the appellants suggest that they needed more time or express that they would not be prepared. Was it August 30, take it or leave it? Or was it, um, would you be prepared by, I mean, it seemed like it was really on fast track. Grease skids, if you will. The appellee argued that it was critical that this issue from your objection, it was one week to the hearing on, on your objection, right? It was not the, the appellees could have objected to the August 30th date. They could have asked for an adjournment. They did not. Did you know, when did you know that the August, August 31 was what, a confirmation hearing? What was it? What was scheduled on August 31? The closing under the, uh, not the confirmation hearing. Okay. But the closing was pushed back, right? Yes. When did you know the closing was going to have to be pushed back? Uh, I'm not sure of the exact date. Um, earlier you asked the appellants, uh, when the, when the August 30th was chosen. Yes. Yes. Because of the imminent closing. So you had to know the date before the closing so that it would not affect the closing. Right. Exactly. So that this claim would be resolved in advance of the closing and so that the purchaser would know how much money to set aside for the payment of, uh, for the contingent liability arising out of this claim, if any. Um, uh, earlier you asked the, uh, appellants, uh, when the plan was confirmed. It was actually, the final plan was actually confirmed in, uh, September 2010 and the plan went, went effective on October 8th, 2010. Yeah, that's what I thought. Okay. Um, but when, but in terms of knowing when the closing on the 31st was to be postponed, it was, did you know it prior to filing the objection that you were going to postpone that hearing or that closing? No. Um, on August, uh, 23rd? No, no. You don't, when was the decision made? Was it made just prior to? It was made prior, prior to the, uh, August 31st hearing after, uh, the hearing on the motion to expedite. Okay. Um, I want to briefly address the due process argument. Um, uh, the appellants, it's undisputed that the appellants. Yeah, I don't have any questions on the due process. All right. All right. Um, uh, um, let me, let me address the appellant's argument. I mean, back when I did this, if I got eight days, some days that was an eternity. Let me address the appellant's argument that the bankruptcy court, uh, prejudged the merits of their claim at the August, uh, 26th hearing. Um, uh, again, their, their initial request did not include any argument about hyperlinking or the Kinney article at, on the, at the August 26th hearing, the bankruptcy court expressed its preliminary and accurate view that their claim had little merit. Um, nevertheless, the bankruptcy court went out of its way to, uh, make clear that its views were preliminary, that it would give the appellants a full opportunity to present their case on the merits. Um, and then it gave the appellants a full opportunity to present their case on, uh, on August 30th, which was an evidentiary hearing. The appellants were able to present, um, witnesses and other evidence, uh, and, and make their arguments. Um, at the end of that hearing, they just failed to meet their burden under section 503B of showing that, uh, their alleged damages were, um, uh, an, an actual necessary cost of preserving the estate. Um, the bankruptcy court also allowed the appellants to develop their brand new hyperlinking argument, which had never been, uh, made before. That, that was not an abusive discretion. Um, lastly, one point that was not addressed by the district court, um, uh, because it, it, it's based on facts which arose after that, is that the statute of limitations on any claim which could possibly arise out of the Kinney article has passed. That article was published in April 2010. Uh, it's now May 2012, and the appellants have not actually pursued a defamation claim arising out of that article. So, in addition to being equitably moot, this, this appeal is actually moot. I thought on the, just back on the equitable mootness. Do you care how you win? No. All right. Thank you. A win is a win. Thank you. If you win. If you win. So, Mr, Mr. Barnes,    but, but, but, but, but, but, but, but, but, but, but, but, but, but,  but, but, but, The response to that, your honor, is that one has to look how a reader of the Kinney article would respond to that information. The reader of the Kinney article who reads all these inflammatory accusations and derogatory claims against charter schools, who then goes to the charter school webpage and sees the highlighted marquee presentation of our articles, is going to make the conclusion that those accusations are attributable to our clients. And in doing so, I thought the reader would say charter schools are bad. The reader will say that. And then the reader will look and say, oh, the reason charter schools are bad is because of these things that were written a few years ago. Well, what the reader, If it was bad a few years ago and it's still bad now, the time to bring the case is within the statute of limitations when it's initially published. Well, the, the articles themselves that, that were included in the charter page were really only a couple of months older than the Kinney article itself. These were in December of 2008. The articles were published. The Kinney article was in April. And the, I want to also respond to a couple of the other issues that were made by the appellees. With respect to the equitable mootness, there was a reference to the SEMCRUD case. Those facts are, are highly different than, than those here in SEMCRUD. On equitable mootness, at least we might be with you. You might want to go to your next point. Okay. We are not, we are going to say that not all litigators are accustomed to having to try cases within eight days. I know as someone who, I think it went to bankruptcy court only when absolutely necessary. I was a little surprised at the way they conducted business. That's for sure. And, and we do acknowledge that in, in bankruptcy, in the bankruptcy context, things are sometimes heard on, on short notice. But typically those, those don't involve matters such as the determination of, of the allowance of claims, especially when the debtor itself. Judge Hardiman was a real litigator. I just did bankruptcy. But when the, when the, when the debtor itself was in control of the process that created the exigent circumstances that was used as the basis for shortening the time period and, and depriving the appellants of, of the opportunity to truly have a meaningful hearing before the judge. The judge himself acknowledged that these are, are, are difficult, weighty issues. And the judge said, I, I don't have time to deal with this. The state court, I'm, I'm shoving it off to the state court. Because there just wasn't time before the bankruptcy court within the shortened period that, that the debtors themselves created to hear these cases. So. Is the result of your case, if you don't prevail, that it'll be washed out in the bankruptcy? The administrative claim will, will be washed out. Yes, Your Honor. Okay. So. If the court doesn't have any further questions. I have no further questions. Thank you. Thank you. Thank you. Thank you to both counsel for well presented arguments. We'll take the matter under advisement.